# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY PHYSICIANS UNITED RECIPROCAL EXCHANGE<br><br>Plaintiff,<br><br>v.<br><br>BOYNTON & BOYNTON, INC., et al.<br><br>Defendants. | Civil Action No. 12-5610 (PGS)<br><br><br>MEMORANDUM OPINION |

**BONGIOVANNI, Magistrate Judge**

This matter comes before the Court upon Boynton & Boynton, Inc. ("Boynton") and Kevin Byrne's ("Byrne") (collectively, the "Boynton Defendants") motion to strike New Jersey Physicians United Reciprocal Exchange's ("NJPURE") economic expert reports. [Docket Entry No. 124]. NJPURE opposes the Boynton Defendants' motion. The Court has reviewed all arguments raised in support of and in opposition to the Boynton Defendants' motion and considers same without oral argument pursuant to L.Civ.R. 78.1(b). For the reasons set forth more fully below, Princeton's motion to strike is GRANTED in part.

## I. Background and Procedural History

NJPURE is a not-for-profit reciprocal interinsurance exchange which provides medical malpractice insurance to physicians and other potential policyholders. (Second Amended Complaint ("SAC") ¶1; Docket Entry No. 26). Boynton is an insurance agency in the business of selling medical malpractice insurance. (*Id.* ¶ 2; Answer to SAC ¶ 2, Docket Entry No. 44). Byrne is a licensed agent of Boynton. (*Id.* ¶ 3; Answer to SAC ¶ 3).

NJPURE filed suit against the Boynton Defendants on September 7, 2012. Since then, it has twice amended its Complaint. Through its Second Amended Complaint, NJPURE claims

that the Boynton Defendants have and continue to make false or misleading written and oral statements to the public about NJPURE's business operations and insurance services. As examples of the Boynton Defendants' false or misleading statements, NJPURE relies on email exchanges between Byrne and two specifically identified prospective clients of NJPURE, as well as on "Marketplace Updates" issued by the Boynton Defendants to NJPURE's prospective clients. NJPURE alleges that the "Marketplace Updates" offer misleading or false comparisons between its financials and those of its for-profit competitors served by the Boynton Defendants. (*Id*. ¶ 24). Given the Boynton Defendants' alleged scheme to disseminate libelous and slanderous information about NJPURE to the public via email and other media, NJPURE has asserted claims against Boynton and Byrne for violations of the Lanham Act, Section 43, 15 U.S.C. § 1125(a) (Unfair Competition), as well as New Jersey common law claims for libel, libel *per se*, slander, slander *per se*, trade libel and tortious interference with prospective contractual relationships. (*Id*. ¶¶ 5-7; 92-139).[1]

Shortly before NJPURE filed its SAC in this matter, on April 10, 2013, it filed suit against The Medical Protective Company, Inc. d/b/a Princeton Insurance Company's ("Princeton"). (*See* Civil Action No. 13-2286). In that case, NJPURE claims that Princeton has and continues to make false or misleading written and oral statements to the public about NJPURE's business operations and insurance services.[2] The only false or misleading statements referenced in the Complaint are Princeton's annual "Marketplace Updates," which NJPURE

---

[1] NJPURE also asserted claims against the Boynton Defendants under the Insurance Trade Practices Act; however, these claims were dismissed. (*See* Op. and Order of 1/28/2014; Docket Entry Nos. 39 & 40).

[2] While NJPURE's Complaint references both written and oral statements (*see, e.g.* Compl. ¶68 in Civil Action No. 13-2286), the only false or misleading statements referenced in the Complaint are Princeton's annual, written "Marketplace Updates" and NJPURE has only asserted various libel claims, no claims for slander, against Princeton.

refers to as the "False Comparative Advertisements." (Compl. ¶ 28 in Civil Action No. 13-2286). NJPURE alleges that the "Marketplace Updates" offer misleading or false comparisons between its financials and those of its for-profit competitors, such as Princeton. (*Id*. ¶ 30). Based on Princeton's distribution of the "Marketplace Updates," NJPURE has asserted a claim against Princeton for violations of the Lanham Act, Section 43, 15 U.S.C. § 1125(a) (Unfair Competition) as well as New Jersey common law claims for libel, libel *per se*, trade libel and tortious interference with prospective contractual relationships. (*Id*. ¶¶ 4-6; 72-108). [3]

While NJPURE sought to consolidate the matters it separately filed against the Boynton Defendants and Princeton, the District Court determined that it would not be appropriate, at least at that juncture, to consolidate both cases for trial purposes. In reaching this conclusion, the District Court found:

> [W]hile both cases involve allegations of the "Market Updates," the Boynton Action clearly contains unrelated claims and allegations based on false written and oral statements made by the Boynton Defendants to customers in an effort to s[ell] malpractice insurance policies that are not present in the Princeton Action. These additional factual and legal issues predominate the Boynton Action, and significantly, they are irrelevant to the Princeton Action; as such, it would not be appropriate to try these cases at the same time.

(Letter Order of 3/23/2015 at 2; Docket Entry No. 75).[4] Nevertheless, given the overlap between the two cases, "both actions concern allegations of Princeton's false advertisement campaign and how those false publications affected NJPURE[,]" the District Court consolidated the matters for discovery purposes. (*Id*.) Since that time, discovery in the two cases has proceeded along the

---

[3] NJPURE also asserted a claim against Princeton under the Insurance Trade Practices Act; however, NJPURE later stipulated to the dismissal of this claim. (*See* Stipulation and Order of Dismissal of 5/8/2014; Docket Entry No. 56 in Civil Action No. 13-2286).
[4] Unless otherwise indicated, all Docket Entry No. references come from Civil Action No. 12-5610).

same schedule and the Court's discovery orders have been simultaneously entered in both cases. Three such orders are primarily relevant to the Boynton Defendants' pending motion to strike.[5]

First, on October 19, 2015, the Court entered a Letter Order addressing the damages related discovery NJPURE was to produce:

> With respect to Princeton's request for discovery concerning NJPURE's damages, the Court agrees that the time has come for NJPURE to identify, with some specificity, what its damages are. Rule 26(a)(1)(A)(iii) requires a party to provide "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" While the precise amount of damages allegedly suffered by NJPURE may be determined at trial, NJPURE is obligated to produce damages related discovery. As a result, to the extent it has not done so, NJPURE is directed to supplement its Initial Disclosures regarding damages as well as its responses to Princeton's damages related discovery requests, such as RPDs # 31 & 44, and Interrogatory # 13. NJPURE must complete this supplementation no later than **October 30, 2015**.

(Letter Order of 10/19/2015 at 2; Docket Entry No. 93).

Second on December 10, 2015, in response to a dispute raised by Princeton regarding the sufficiency of the damages related discovery produced by NJPURE, the Court entered a Letter Order finding:

> The Court is underwhelmed by NJPURE's response / production regarding damages. It is clear that at this juncture that its claim of damages is speculative. While the Court appreciates that precision with respect to damages may come via expert discovery and that a damages calculation may evolve over time and become fine-tuned by the time of trial, at this instant, to speak colloquially, NJ Pure appears to have nothing. Indeed, NJPURE's

---

[5] Given that the two cases have not been consolidated for trial purposes coupled with the fact that the Boynton Defendants and Princeton raised different issues regarding the Soudry Reports, the Court directed that the Boynton Defendants and Princeton file separate motions to strike. (Letter Order of 7/11/2016 at 10; Docket Entry No. 123). The Court addresses the two motions to strike separately, with only the Boynton Defendants' motion being discussed herein.

supplementation of its Initial Disclosures with respect to damages stated in total:

> Plaintiff has asserted in Counts Four and six of the Second Amended Complaint claims of Libel *per se* and Slander *per se* for which damages are presumed as a matter of law.  See d.g, <u>MacKay v. CSK Publ. Co., Inc.</u>, 300 N.J. Super. 599 (App. Div. 1997).  Plaintiff seeks all such presumed damages against defendants in this matter.

> In addition to the foregoing, plaintiff seeks all damages pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, including but not limited to plaintiff's lost profits, the profits of defendants attributable to the actionable conduct, and corrective advertising expenses.  Plaintiff's investigation into the full scope of damages is ongoing and continuing.  To date, plaintiff has identified the following insureds/potential insureds whose business was lost in substantial part due to defendants' wrongful conduct as described in the complaint and discovery exchanged:  Dr. Mary Anne Fury; Dr. Babak Behin; Dr. Ghassan Khani; Dr. Marc Levine; Dr. Joshua Wolpert; Dr. Mark Ditmar; Dr. Pavlinka Dundeva-Baleva; Dr. Aravinda Reddy; Dr. Sandra Ann Mead; Dr. Babatunji Omotoso; Dr. Mansoora Chaudry; Dr. Mainish Saini; Dr. Julie Lorber; Dr. Fauzia Hameed; Dr. Patricia Graham; Dr. James Schlesinger; Dr. Eugene Jerome Lind; Dr. Phillip Paparone; Dr. Lisa Simone Vernon, Pulmonary & Allergy Associates, P.A. and University Radiology Group.

> Plaintiff believes that the amount of monetary damages caused by the defendants' wrongful conduct as described in the complaint and discovery to be in excess of $2,000,000.  Plaintiff has not yet retained expert witnesses with regard to the exact quantum of damages.

> Plaintiff reserves the right to amend and/or supplement the foregoing responses as discovery continues in this matter.

(Letter from Manuel J. Almeida, Jr. to James M. Nardelli of 10/30/2015).

NJPURE's cases have been collectively pending for over 2½ years. They need to move. Any information NJPURE seeks to rely upon either directly or through an expert for the purposes of establishing damages that is in NJPURE's possession, custody or control needs to be produced **NOW**. If it is not, and the Court determines that it should have been, then NJPURE shall be precluded from later relying on it to establish its damages claim. In other words, if nothing else is produced/identified, the Court shall presume that NJPURE's current production of facts/documents/information is complete and NJPURE shall be limited to same. While the Court appreciates that depositions can be used to elucidate the parties' positions, they are not a substitute for adequate paper discovery.

Under these circumstances, the Court finds that the **March 1, 2016** end date for fact discovery remains sufficient. The parties should be able to take the 7 depositions they previously anticipated and had scheduled as well as any additional depositions in that time period. NJPURE shall produce its expert report(s) by **April 15, 2015**. NJPURE is reminded that all facts or data considered by its expert in forming his opinions must be disclosed with its expert report(s). *See* FED.R.CIV.P. 26(a)(2)(B)(ii). If, after reviewing NJPURE's expert report(s), Princeton believes that information considered by the expert was not timely produced, Princeton may seek to preclude the District Court's consideration of all or a portion of the report(s).

(Letter order of 12/10/2015 at 2-4; Docket Entry No. 104).

Third, on May 4, 2016, in response to a dispute raised by the Boynton Defendants regarding damages related discovery served by NJPURE on February 8, 2016, the Court entered a Letter Order holding:

[T]hese requests were made out of time. It should come as no surprise to any party that for the past six months, the Court has been vigorously pushing the parties to complete fact discovery. In this regard, the Court issued two Letter Orders regarding the need for damages related discovery to be produced immediately. (*See* Letter Orders of 10/19/2015 and 12/10/2015; Docket Entry Nos. 97 & 102 in Civil Action No. 12-5610). While both Letter Orders were directed to NJPURE's production of information, the tenor of said Orders made it clear that the time had come for all fact discovery,

including damages discovery, to be completed. Indeed, in the Court's Letter Order entered on December 10, 2015, the Court specifically held that the March 1, 2016 end date for fact discovery remained sufficient, refusing to extend same. (Docket Entry No. 102 at 3).

The importance of completing all fact discovery, including damages related discovery, by March 1, 2016 was to give the parties, particularly NJPURE and its expert, sufficient time to digest the materials produced and serve their expert reports in a timely fashion. NJPURE's expert report was due on April 29, 2016. The Court was not anticipating information being produced after March 1, 2016 because such a production would likely interfere with the expert discovery schedule set in this case.

NJPURE's discovery requests served on February 8, 2016 do not comply with the Court's December 10, 2015 Letter Order. Parties have 30 days to respond to discovery demands. *See* FED.R.CIV.P. ("Rule") 33(b)(2); 34(a)(2)(A). No shorter time was set by the Court. To have been timely, NJPURE's requests should have been made by the end of January at the latest. While under other circumstances, the Court may have excused the delay, the Court is unpersuaded that under the circumstances of this case, where since the Fall of 2015 the Court had been hounding NJPURE to identify the information it intended to rely upon to establish its damages, there is good cause to adjust the deadline and require the Boynton Defendants to respond to NJPURE's discovery demands.[] There is simply no conceivable reason why NJPURE waited until February 8, 2016 to request this additional information from the Boynton Defendants. If NJPURE believed further discovery was necessary, it should have requested same sooner.

(Letter Order of 5/4/2017 at 2-3; Docket Entry No. 107).

On April 29, 2015, NJPURE served the Boynton Defendants with Mr. Michael Soudry's preliminary analysis report, which addressed NJPURE's alleged damages. On May 20, 2016, NJPURE served the Boynton Defendants with a supplemental report on damages. Upon receipt and review of same, the Boynton Defendants wrote the Court asking that both Mr. Soudry's preliminary analysis report and supplemental report (collectively, the "Soudry Reports") be stricken because in same, in contravention of the Court's Orders, Mr. Soudry relied on

documents and information never produced by NJPURE during discovery and because the

information Mr. Soudry relied on to perform his Lanham Act damages calculation is vague,

speculative, confusing and unsupported.  (Letter from Jason T. LaRocco to Hon. Tonianne J.

Bongiovanni of 6/13/2016).  After receiving additional informal letter briefing on the Boynton

Defendants' request to strike the Soudry Reports, the Court determined that in light of the

significance of the issues raised, "not only in terms of the numbers of issues raised, but also

based on the impact a decision regarding those issues could have on NJPURE[,]" the question of

whether the Soudry Reports should be stricken "should be the subject of formal motion

practice."  (Letter Order of 7/11/2016 at 9; Docket Entry No. 123).  As a result, the Boynton

Defendants filed the instant motion to strike in accordance with the briefing scheduled outlined

in the Court's July 11, 2016 Letter Order.  (*Id*. at 10).

## II.     The Parties Arguments

### A.  The Boynton Defendants' Arguments

The Boynton Defendants argue that the Soudry Reports should be stricken under

FED.R.CIV.P. ("Rule") 37(b)(2)(A)(ii) because they rely on documents and information never

produced in discovery, despite this Court's Orders requiring all damages related discovery to be

produced.  In addition, the Boynton Defendants argue that the portion of the Soudry Reports

dedicated to NJPURE's Lanham Act damages must also be stricken as speculative because it

estimates the commissions earned by Boynton.

With respect to the documents and information NJPURE failed to produce, the Boynton

Defendants focus on the following pieces of information:  (1) an email from NJPURE to a

physician group known as University Radiology Group ("URG") that disclosed a May 18, 2012

rate indication; (2) a document titled "View Activity Report" for Dr. Edred Shen; and (3)

NJPURE's "policy retention rates" and "group retention rates" for 2004-2014. The Boynton Defendants argue that NJPURE failed to produce any of this information during open fact discovery and relies on all of it to calculate its damages.

With respect to the Lanham Act damages calculations included in the Soudry Reports, the Boynton Defendants argue that the damages set forth are entirely speculative because NJPURE is unable to identify a single document from the Boynton Defendants that details the actual commissions earned. On this point, the Boynton Defendants note that NJPURE's inability to do so stems from the fact that NJPURE failed to timely request any such information from the Boynton Defendants in discovery. Instead, NJPURE waited until February 8, 2016 to request damages related discovery from the Boynton Defendants despite the fact that fact discovery was set to close on March 1, 2016 and the Court had been pressing the parties to complete damages related discovery since October 2015. (*See* Boynton Def. Br. at 2). The Boynton Defendants note that the Court precluded the damages related discovery requested by NJPURE because under the Rules, the discovery requests did not give the Boynton Defendants sufficient time to respond before the March 1, 2016 fact discovery deadline. (*Id*. (citing Letter Order of 5/4/2016)).

As a result, the Boynton Defendants argue that the Soudry Reports should be stricken based on the following factors outlined in *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81 (D.N.J. 2006); *Eli Lily & Co. v. Actavis Elizabeth, LLC*, No. 07-3770, 2010 U.S. Dist. LEXIS 44913 (D.N.J. May 7, 2010), *Ford Motor Co. v. Edgewood properties, Inc.*, No. 06-1278, 2011 WL 5828661 (D.N.J. Nov. 18, 2011); and *Ware v. Rodale Press, Inc.*, 322 F.3d 218 (3d Cir. 2003), which apply equally to Rule 37(b)(2)(A) and Rule 37(c)(1): (1) prejudice / surprise; (2) ability to

cure prejudice; (3) disruption to the orderly and efficient trial of a case or other cases; and (4) bad faith or willfulness.  (*Id*. at 15).

Specifically, the Boynton Defendants argue that they are prejudiced by NJPURE's failure to produce the damages related discovery relied upon by its expert and failure to conduct Lanham Act damages related discovery in a timely fashion.  In this regard, the Boynton Defendants claim that they have been clearly prejudiced by NJPURE's "failure to produce the documents relied upon by Soudry to calculate [NJPURE]'s alleged lost premiums for URG and Dr. Shen."  (*Id*. at 16).  They also argue that they have been prejudiced by NJPURE's failure to produce its policy retention rates and group retention rates as they cannot critically evaluate Mr. Soudry's conclusion that the accounts at issue would have been retained for years.  Thus, for example, they cannot adequately review the accuracy of the damages calculation, which estimates that URG, Dr. Shen and Pulmonary & Allergy Associates, P.A. ("PAA") would have been retained for years, resulting in millions of dollars of damages.  Further, the Boynton Defendants argue that NJPURE's failure to produce the retention rates is prejudicial because the Soudry Reports claim a retention rate from 2004-2014 that differs from NJPURE's advertised renewal rate and the Boynton Defendants have been denied the opportunity to explore this difference and evaluate the assertions that underlie NJPURE's expert's damages calculations. Similarly, they lack the ability to conduct discovery on when the group retention rates are used. For example, the Boynton Defendants note that in his reports, Mr. Soudry relies on group retention rates for URG, but does not apply this group rate to PAA.   (Boynton Def. Reply at 4-5).

Further, the Boynton Defendants claim they have been prejudiced by NJPURE's failure to conduct "Lanham Act damages discovery in a timely manner" because in order "to properly

respond to the speculative claims within the Soudry expert report they would need to request that discovery be reopened and that they now be permitted to produce the very same type of documents which the Court had previously relieved the Boynton Defendants from having to produce." (Boynton Def. Br. at 17). The Boynton Defendants argue that "[i]t is not appropriate to require Boynton & Boynton to conduct a substantial inquiry in support of its defense after discovery has closed when the fundamental information that gives rise to the need for the inquiry was not itself disclosed by plaintiff until after discovery closed." (Boynton Def. Reply at 6).

In addition, the Boynton Defendants argue that NJPURE is unable to cure the prejudice. In this regard, the Boynton Defendants note that fact discovery is closed. They further maintain that the Court made clear in its December 10, 2015 Letter Order that it would not extend discovery beyond the March 1, 2016 deadline. Thus, they argue there is no way to cure the prejudice imposed by NJPURE's failure to timely engage in damages related discovery.

Similarly, the Boynton Defendants argue that reopening fact discovery "would certainly disrupt the currently established pretrial deadlines and would delay trial." (Boynton Def. Br. at 17) For example, they contend that discovery would not merely have to be opened to allow NJPURE to produce the as-to-now unproduced documents relied upon by its expert. Instead, both the Boynton Defendants and Princeton would have to be given the opportunity to explore what additional discovery would be needed given these documents' importance to Mr. Soudry's damages calculation. The Boynton Defendants argue that doing so would reward NJPURE for its failure to comply with this Court's Orders.

Further, as to the claimed Lanham Act damages, the Boynton Defendants argue that they would have to go back and engage in the discovery the Court precluded to review "its files for the **actual** information regarding the commissions earned from URG and PAA[.]" (*Id*. at 18).

Moreover, the Boynton Defendants claim that after it did so, NJPURE would seek to yet again supplement its economic expert's damages report and the Boynton Defendants' expert would have to review the newly produced information and prepare an appropriate rebuttal report. The Boynton Defendants argues that this would clearly delay the matter for several months and disrupt this litigation.[6]

Lastly, the Boynton Defendants argue that NJPURE acted in bad faith. The Boynton Defendants claim that this Court's October 19 and December 10, 2015 Letter Orders unequivocally put NJPURE on notice of what was expected of it. The Boynton Defendants argue that the fact that NJPURE in the Soudry Reports sought to rely on damages related information that was either never produced or which was sought and time barred establishes that it acted in bad faith.

Based on the foregoing and the applicable case law, the Boynton Defendants argue that the Soudry Reports should be stricken and that NJPURE be precluded from offering any expert testimony in support thereof. Further, they argue that in light of the Court's repeated warnings regarding the need to produce damages related discovery, it would not be adequate to simply strike the portions of the Soudry Reports relying on the undisclosed information. Instead, the Boynton Defendants claim that "[s]triking the portion of the damages calculation that is essential to Mr. Soudry's conclusion requires striking the entire calculation, not just the parts of the calculation that reduce the quantum of damages claims." (Boynton Def. Reply at 5).

---

[6] Like Princeton, the Boynton Defendants also contend that NJPURE's inability to comply with previous discovery orders make it likely that this additional discovery would be even further delayed.

**B. NJPURE's Arguments**

NJPURE opposes the Boynton Defendants' motion to strike. In so doing, they raise a few main arguments. First, NJPURE argues that the Boynton Defendants' motion to strike should be denied because the information the Boynton Defendants' claim went unproduced does not affect the entirety of the Soudry Reports. Second, NJPURE argues that the Boynton Defendants have not been prejudiced by the inclusion of limited undisclosed information in the Soudry Reports. Third, NJPURE argues that it did not act in bad faith nor were its actions willful. Fourth, NJPURE claims that its asserted Lanham Act damages are not speculative.

As to the specific documents/information the Boynton Defendants claim went unproduced, NJPURE contends that only the retention rate charts and exact premiums for Dr. Shen and PAA were not disclosed in fact discovery. NJPURE maintains that the premium information for URG and Dr. Lorber was produced in discovery via both its own production as well as from Franca Hobbs, a representative of URG, who produced information in response to a subpoena. In this regard, NJPURE notes that on December 21, 2015, when it supplemented its damages related discovery, it produced emails demonstrating that "a rate indication was provided with respect to URG for a premium between '$1,687,500-$1,820,000.'" (NJPURE Opp. at 7; Docket Entry No. 125). Similarly, NJPURE indicates that in that production it also produced rate indication quotes for Dr. Julie Lorber in the amount of $26,744 for 2011 and $25,847 for 2013. (*Id*.) Further, NJPURE notes that on January 20, 2016, Franca Hobbs, the representative of URG named in NJPURE's Complaint, produced an email establishing that URG was given a rate indication by Plaintiff of $1,560,000. (*Id*. at 8). NJPURE highlights that in his expert report, Mr. Soudry used the lowest known premium number to calculate damages related to URG; thus the Boynton Defendants benefited from the use of the $1,560,000 number identified

in Ms. Hobbs' production instead of the use of a higher number disclosed in the Boynton Defendants' production.

Despite the fact that limited information went undisclosed in discovery, NJPURE nevertheless argues that the Boynton Defendants have not been prejudiced by same.  In this regard, NJPURE argues that all of the physicians and medical practices included in the Soudry Reports were identified within the Court's deadline for the production of damages related discovery.  In addition, NJPURE claims that these physicians / medial practices are the insureds and/or customers of Defendants, and therefore Defendants know what premiums they pay.

Further, with respect to the undisclosed policy retention rate and group retention rate information disclosed in the charts included in the Soudry Reports, NJPURE argues that it did not produce this information because it never expected retention rates to be used in relation to damages.  NJPURE argues that Mr. Soudry used this information to generate a conservative damages calculation, which actually benefits (not prejudices) the Boynton Defendants as the retention rate information was used to reduce NJPURE's damages.  Moreover, NJPURE claims that if the Boynton Defendants believed the retention rate information or any premium information disclosed in the Soudry Reports was significant, they could have questioned three different witnesses, all of whom were deposed after said information was produced in the Soudry Reports - Dr. Lena Chang, Eric Poe or Joana Quaintance – regarding same.  (*Id*. at 15).

NJPURE also maintains that there is no incurable prejudice to Princeton because Princeton has not yet served its expert reports.  As a result, NJPURE contends that Princeton can confer with its experts regarding the information set forth in the Soudry Reports and its experts can address any issues raised.  Thus, while discovery may have "been an issue of contention in this matter," NJPURE argues "[t]here simply is no prejudice to the [Boynton] Defendants, as

Defendants have not served any expert reports, no expert depositions have been completed, no summary judgment motions have been filed, and there is no trial date." (*Id*. at 18). Under these circumstances, NJPURE claims that the Boynton "Defendants have had ample time to deal with what little surprise may exist and there has been no prejudice to the Defendants." (*Id*.) "Based on the foregoing," NJPURE contends that there has also been "no bad faith or willfulness" on its part. (*Id*. at 19). As a result, under the relevant case law, NJPURE argues that the Soudry Reports should not be stricken.

In addition, NJPURE maintains that the Lanham Act damages outlined in the Soudry Report are not speculative and therefore should not be stricken. In this regard, NJPURE argues that pursuant to "15 U.S.C. § 1117(a) . . . '[i]n assessing profits the plaintiff shall be required to provide defendant's sales only; defendant must prove all elements of cost or deduction claimed.'" (*Id*. at 20 (quoting 15 U.S.C. § 1117(a))). NJPURE argues that it "can claim the premiums received by Boynton from University Radiology and Pulmonary & Allergy Associates as their 'sales' in estimating damages." (*Id*.) Furthermore, "[d]espite Boynton's failure to provide their commission statements pursuant to R.26," NJPURE argues that it "can point to the testimony of multiple individuals, including that of Defendants Boynton and Princeton's representatives, to establish the premiums earned by Boynton." (*Id*. at 21). Based on this testimony, NJPURE's expert utilized 8% for the commissions earned by NJPURE. "In light of the fact that three of the four Boynton witnesses testified that the commissions paid to Boynton are 8% or higher," NJPURE contends that "the report of Soudry is very conservative, not speculative." Thus, NJPURE maintains that "Soudry's mathematical calculations based upon this testimony are sufficiently reliable and will assist the jury in its consideration of damages." (*Id*.)

### III.    Analysis

Without awaiting a discovery request, Rule 26(a)(1)(A)(iii) requires each party to provide to the other parties "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" Given NJPURE's alleged failure to produce sufficient information regarding its damages, the Court twice entered Letter Orders addressing NJPURE's obligation to produce damages related discovery. First, on October 19, 2015, the Court ruled:

> With respect to Princeton's request for discovery concerning NJPURE's damages, the Court agrees that the time has come for NJPURE to identify, with some specificity, what its damages are. Rule 26(a)(1)(A)(iii) requires a party to provide "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" While the precise amount of damages allegedly suffered by NJPURE may be determined at trial, NJPURE is obligated to produce damages related discovery. As a result, to the extent it has not done so, NJPURE is directed to supplement its Initial Disclosures regarding damages as well as its responses to Princeton's damages related discovery requests, such as RPDs # 31 & 44, and Interrogatory # 13. NJPURE must complete this supplementation no later than **October 30, 2015**.

(Letter Order of 10/19/2015 at 2). Second, on December 10, 2015, the Court held:

> The Court is underwhelmed by NJPURE's response / production regarding damages. It is clear that at this juncture that its claim of damages is speculative. While the Court appreciates that precision with respect to damages may come via expert discovery and that a damages calculation may evolve over time and become fine-tuned by the time of trial, at this instant, to speak colloquially, NJ Pure appears to have nothing. Indeed, NJPURE's supplementation of its Initial Disclosures with respect to damages stated in total:

Plaintiff has asserted in Counts Four and six of the Second Amended Complaint claims of Libel *per se* and Slander *per se* for which damages are presumed as a matter of law.  See d.g, <u>MacKay v. CSK Publ. Co., Inc.</u>, 300 N.J. Super. 599 (App. Div. 1997). Plaintiff seeks all such presumed damages against defendants in this matter.

In addition to the foregoing, plaintiff seeks all damages pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, including but not limited to plaintiff's lost profits, the profits of defendants attributable to the actionable conduct, and corrective advertising expenses.  Plaintiff's investigation into the full scope of damages is ongoing and continuing.  To date, plaintiff has identified the following insureds/potential insureds whose business was lost in substantial part due to defendants' wrongful conduct as described in the complaint and discovery exchanged:  Dr. Mary Anne Fury; Dr. Babak Behin; Dr. Ghassan Khani; Dr. Marc Levine; Dr. Joshua Wolpert; Dr. Mark Ditmar; Dr. Pavlinka Dundeva-Baleva; Dr. Aravinda Reddy; Dr. Sandra Ann Mead; Dr. Babatunji Omotoso; Dr. Mansoora Chaudry; Dr. Mainish Saini; Dr. Julie Lorber; Dr. Fauzia Hameed; Dr. Patricia Graham; Dr. James Schlesinger; Dr. Eugene Jerome Lind; Dr. Phillip Paparone; Dr. Lisa Simone Vernon, Pulmonary & Allergy Associates, P.A. and University Radiology Group.

Plaintiff believes that the amount of monetary damages caused by the defendants' wrongful conduct as described in the complaint and discovery to be in excess of $2,000,000.  Plaintiff has not yet retained expert witnesses with regard to the exact quantum of damages.

Plaintiff reserves the right to amend and/or supplement the foregoing responses as discovery continues in this matter.

(Letter from Manuel J. Almeida, Jr. to James M. Nardelli of 10/30/2015).

NJPURE's cases have been collectively pending for over 2½ years. They need to move. Any information NJPURE seeks to rely upon either directly or through an expert for the purposes of establishing damages that is in NJPURE's possession, custody or control needs to be produced **NOW**. If it is not, and the Court determines that it should have been, then NJPURE shall be precluded from later relying on it to establish its damages claim. In other words, if nothing else is produced/identified, the Court shall presume that NJPURE's current production of facts/documents/information is complete and NJPURE shall be limited to same. While the Court appreciates that depositions can be used to elucidate the parties' positions, they are not a substitute for adequate paper discovery.

Under these circumstances, the Court finds that the **March 1, 2016** end date for fact discovery remains sufficient. The parties should be able to take the 7 depositions they previously anticipated and had scheduled as well as any additional depositions in that time period. NJPURE shall produce its expert report(s) by **April 15, 2015**. NJPURE is reminded that all facts or data considered by its expert in forming his opinions must be disclosed with its expert report(s). *See* FED.R.CIV.P. 26(a)(2)(B)(ii). If, after reviewing NJPURE's expert report(s), Princeton believes that information considered by the expert was not timely produced, Princeton may seek to preclude the District Court's consideration of all or a portion of the report(s).

(Letter Order of 12/10/2015 at 2-4).

Despite these very explicit Letter Orders, NJPURE failed to produce in discovery all of the information its damages expert relied upon in crafting the Soudry Reports. Instead, as the Boynton Defendants note, the following information was not produced by NJPURE during discovery: (1) an email from NJPURE to "URG that disclosed a May 18, 2012 rate indication; (2) a document titled "View Activity Report" for Dr. Edred Shen; and (3) NJPURE's policy retention rates and group retention rates for 2004-2014. The Court, therefore, must determine what, if any, sanction(s) is warranted. The Court must also address whether NJPURE's Lanham Act damages should be stricken at this juncture.

Rule 37 authorizes the Court to impose a wide range of sanctions on a party who has failed to comply with its discovery obligations. In this regard, Rule 37(b)(2)(A) provides:

> If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following: . . . (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]

Further, Rule 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

In deciding whether to impose sanctions under Rule 37(c)(1), the Court considers four factors:

> (1) prejudice or surprise to the Plaintiffs; (2) the ability of Plaintiffs to cure the prejudice; (3) the likelihood of disruption; and (4) the Defendants' bad faith or unwillingness to comply. These factors are nearly identical to the factors this Court considers when deciding to exclude evidence under Rule 37(b)(2): (1) the prejudice or surprise to Plaintiffs; (2) the ability of Plaintiffs to cure that prejudice; (3) the extent to which the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness of Defendants in failing to comply with the court's order.

*Wachtel.*, 239 F.R.D. at 104-05 (D.N.J. 2006) (citations omitted). Further, where the exclusion sought under Rule 37(b)(2) "is tantamount to dismissing the claim," such as precluding any

evidence of damages at trial where damages are a necessary element of the claim at issue, the

Court also considers the factors outlined in *Poulis*:

> "(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense."

*Ware*, 322 F.3d at 221 (quoting *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d

Cir. 1984)).

### 1. Prejudice or Surprise to the Boynton Defendants

The Court finds that the Boynton Defendants have been prejudiced by NJPURE's

reliance on the unproduced damages related information in the Soudry Reports. While NJPURE

tries to minimize its importance, the Court finds that the unproduced information relied upon in

the Soudry Reports is significant. For example, the undisclosed data forms the factual basis of

NJPURE's damages calculation. Indeed, it is used to assert damages worth more than $1 million

per lost customer when initial projections estimated damages to be approximately $100,000 per

lost costumer. The unproduced retention rate information, for instance, is used to justify

NJPURE's claim for damages over multiple years. The Boynton Defendants should have had

the opportunity to take discovery on same, particularly in light of the fact that the charts relied

upon in the Soudry Report set forth rates different from the rate advertised by NJPURE and the

fact that while Mr. Soudry utilizes group retention rates for URG, the group rates are not utilized

in connection with PAA. The Court finds that the Boynton Defendants have been prejudiced by

the inability to take discovery on these rates and analyze them in a timely matter. Moreover, the

fact that the Boynton Defendants' experts may be able to address the undisclosed information in

their yet unserved expert reports does not cure the prejudice. Because of NJPURE's untimely disclosure, the Boynton Defendants have been denied the opportunity to arm their own experts with additional information regarding the previously unproduced information, thereby impairing the Boynton Defendants' experts' ability to challenge the assertions contained in the Soudry Reports.

### 2. Ability of the Boynton Defendants to Cure the Prejudice

Here, the Court finds that the Boynton Defendants would be unable to cure the prejudice caused by NJPURE's reliance on information not properly disclosed during fact discovery. On multiple occasions, the Court explicitly refused to extend the fact discovery deadline. (*See* Letter Order of 5/4/2016 at 2-4 (determining that good cause did not exist to adjust the fact discovery deadline, noting that "for the past six months, the Court has been vigorously pushing the parties to complete fact discovery" and that "the tenor of [its past] Orders made it clear that the time had come for all fact discovery, including damages discovery, to be completed"); Letter Order of 12/10/2015 (holding that under the circumstances of the case "the **March 1, 2016** end date for fact discovery remains sufficient" and refusing to extend same.)) It would, therefore, be entirely inconsistent to reopen discovery now.

Moreover, not only would it be inconsistent to do so, but it would also be unfitting. The Court could not have been any clearer regarding NJPURE's obligations. As already noted, on October 19, 2015, NJPURE was unambiguously informed that:

> [T]he time has come for NJPURE to identify, with some specificity, what its damages are. Rule 26(a)(1)(A)(iii) requires a party to provide "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" While the precise amount of

damages allegedly suffered by NJPURE may be determined at trial, NJPURE is obligated to produce damages related discovery. As a result, to the extent it has not done so, NJPURE is directed to supplement its Initial Disclosures regarding damages as well as its responses to Princeton's damages related discovery requests, such as RPDs # 31 & 44, and Interrogatory # 13.

(Letter Order of 10/19/2015 at 2). Similarly, on December 10, 2015, the Court unequivocally

stated that NJPURE's damages related discovery was deficient and directed NJPURE to

immediately produce said discovery or run the risk of having the information barred later on:

The Court is underwhelmed by NJPURE's response / production regarding damages. It is clear that at this juncture that its claim of damages is speculative. While the Court appreciates that precision with respect to damages may come via expert discovery and that a damages calculation may evolve over time and become fine-tuned by the time of trial, at this instant, to speak colloquially, NJ Pure appears to have nothing.

*** 

NJPURE's cases have been collectively pending for over 2½ years. They need to move. Any information NJPURE seeks to rely upon either directly or through an expert for the purposes of establishing damages that is in NJPURE's possession, custody or control needs to be produced **NOW**. If it is not, and the Court determines that it should have been, then NJPURE shall be precluded from later relying on it to establish its damages claim. In other words, if nothing else is produced/identified, the Court shall presume that NJPURE's current production of facts/documents/information is complete and NJPURE shall be limited to same. While the Court appreciates that depositions can be used to elucidate the parties' positions, they are not a substitute for adequate paper discovery.

*** 

NJPURE shall produce its expert report(s) by **April 15, 2015**. NJPURE is reminded that all facts or data considered by its expert in forming his opinions must be disclosed with its expert report(s). *See* FED.R.CIV.P. 26(a)(2)(B)(ii). If, after reviewing NJPURE's expert report(s), Princeton believes that information considered by the expert was not timely produced, Princeton may seek to preclude the District Court's consideration of all or a portion of the report(s).

(Letter Order of 12/10/2015 at 2-4). Thus, NJPURE knew it was obliged to produce all information it intended to rely upon to prove damages and was warned that if it attempted to rely on any unproduced information, including through its expert, it would be precluded from doing so. Under these circumstances, the Court finds that it would be inappropriate to reopen fact discovery.[7]

Furthermore, the Court finds that the prejudice is not cured by the fact that the Boynton Defendants have yet to serve their own expert reports. While the Boynton Defendants' experts would be able to address Mr. Soudry's opinions using the information included in his reports, that does not change the fact that the Boynton Defendants were denied timely access to this information and the ability to obtain discovery on it.

### 3. The Likelihood of Disruption

The Court finds that allowing NJPURE, through the Soudry Reports, to rely on the unproduced documents would disrupt these proceedings. As noted above, the Boynton Defendants were denied the opportunity to obtain discovery regarding the unproduced documents. They were not, for example, able to explore how the retention rates were measured, why they differed from NJPURE's advertised rate or how they factored into and were utilized in NJPURE's business.

---

[7] The Court finds that doing so would also be unfair to the Boynton Defendants. At the time the Boynton Defendants' motion to strike was filed, this case had already been pending for close to four years. Reopening discovery at this juncture would certainly delay the resolution of this already protracted litigation, and, given how discovery has proceeded to date, the Court suspects that the delay would not be insubstantial.

As also noted, there is no way to cure this prejudice because based on the history of the Court's Orders, reopening discovery at this juncture would be inappropriate.[8] The Court's scheduling orders mean something. Indeed, they "'are at the heart of case management'" and integral to the Court's control of its docket. *Estate of Harrison v. Trump Plaza Hotel & Casino*, Civil No. 12-6683 (RBK/KMW), 2015 WL 6951691, at *2 (D.N.J. Nov. 11, 2015) (quoting *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3d Cir. 1986)). Parties should take comfort from the fact that they can rely upon the deadlines set by the Court. Indeed, it should be the parties' expectations that the deadlines set by the Court are fixed and intended to govern the matter going forward. Otherwise, the entire process would be undermined. *See GlobespanVirata, Inc. v. Texas Instruments, Inc.*, 2015 WL 1638136, at *4 (D.N.J. July 12, 2005) (noting that "'scheduling orders are the heart of the case management [and cannot] be flouted'" as they "'are designed to offer a degree of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed and the case will proceed.'") (Citations omitted).

Furthermore, it would certainly be disruptive to the just resolution of this action to allow NJPURE to rely on information supporting its damages calculation that the Boynton Defendants did not have access to before fact discovery closed. *See* Rule 1 (stating that "[t]hese rules . . . should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.")

---

[8] Moreover, as suggested above, given how this case has been litigated to date, even if the Court found that an extension of discovery was appropriate, which it does not, the Court would also find that said extension would be disruptive to this litigation, likely prolonging the pretrial of this matter (and therefore delaying the trial of this matter) for several months.

#### 4. NJPURE's Bad Faith or Unwillingness to Comply

Although NJPURE did not initially adequately comply with its obligation to produce damages related discovery, as evidenced by the Court's Letter Orders dated October 19 and December 10, 2015, it is clear that NJPURE did ultimately produce significant information related to its purported damages during the fact discovery period. While the Court generally anticipates a more fulsome production, given the production ultimately made, the Court does not find that NJPURE acted in bad faith or was unreasonably unwilling to comply with the Court's Orders or its obligations under the Federal Rules of Civil Procedure. NJPURE is responsible for failing to produce (1) the email it sent to URG that disclosed a May 18, 2012 rate indication; (2) the "View Activity Report" for Dr. Edred Shen; and (3) its policy retention rates and group retention rates for 2004-2014; however, the Court finds that this failure did not result from bad faith or willfulness.

Under these circumstances, despite the Boynton Defendants' claim to the contrary, the Court finds that striking the Soudry Reports in total is too harsh a sanction to impose. Nevertheless, given the Court's explicit instructions, the Court finds that precluding NJPURE from relying on the undisclosed information is appropriate. As a result, by **September 15, 2017**, NJPURE is directed to serve a revised economic expert report that does not reference or rely upon (1) the email it sent to URG that disclosed a May 18, 2012 rate indication; (2) the "View Activity History" for Dr. Edred Chen; or (3) its policy retention rates and group retention rates for 2004-2014. The Boynton Defendants shall serve their expert reports by **October 20, 2017**.

#### 5. NJPURE's Lanham Act Damages

The Court shall not, at this juncture, strike the Lanham Act damages calculations set forth in the Soudry Reports. In the first instance, the Court finds that the Boynton Defendants'

concerns regarding the "speculative" nature of Mr. Soudry's calculations is the reliability of the foundation of same and, as such, are more appropriately addressed in a *Daubert* motion during *in limine* motion practice.

With respect to the Boynton Defendants' arguments regarding the need to reopen discovery in order to address the Lanham Act damages calculation, the Court disagrees that doing so would be appropriate. As already set forth, herein, fact discovery closed on March 1, 2016 and on multiple occasions the Court refused to extend that deadline. In fact, the reason NJPURE was denied the opportunity to obtain discovery on the Boynton Defendants' commissions is because the Boynton Defendants objected to NJPURE's discovery requests served on May 4, 2016. Despite the untimely nature of the requests, the Boynton Defendants could have elected to have responded to same. They did not and the Court agreed with their assessment that the requests were untimely:

> NJPURE's discovery requests served on February 8, 2016 do not comply with the Court's December 10, 2015 Letter Order. Parties have 30 days to respond to discovery demands. *See* FED.R.CIV.P. ("Rule") 33(b)(2); 34(a)(2)(A). No shorter time was set by the Court. To have been timely, NJPURE's requests should have been made by the end of January at the latest. While under other circumstances, the Court may have excused the delay, the Court is unpersuaded that under the circumstances of this case, where since the Fall of 2015 the Court had been hounding NJPURE to identify the information it intended to rely upon to establish its damages, there is good cause to adjust the deadline and require the Boynton Defendants to respond to NJPURE's discovery demands.[1] There is simply no conceivable reason why NJPURE waited until February 8, 2016 to request this additional information from the Boynton Defendants. If NJPURE believed further discovery was necessary, it should have requested same sooner.

(Letter Order of 5/4/2017 at 2-3; Docket Entry No. 107).

Certainly at the time the Boynton Defendants objected to NJPURE's belated damages related discovery requests, they knew or should have known that even if the Court agreed with

them and precluded NJPURE's requested discovery, it was unlikely that NJPURE would simply walk away from its claim for Lanham Act damages. Instead, it should have been apparent that even without access to the requested discovery, NJPURE would pursue Lanham Act damages based on the established record rather than forego same. The Boynton Defendants do not get to have their cake and eat it to. The Court shall not hear any complaints that the discovery they objected to and which the Court precluded is now necessary for them to support their defense. The Court appreciates that "[u]nder Section 35 of the Lanham Act, 15 U.S.C. Section 1117(a), it is Boynton & Boynton's burden to put forth evidence in its defense about expenses associated with the income, since these expenses reduce the damage calculation and potential recovery of the plaintiff." (Boynton Reply at 6). However, this has always been the case. The Boynton Defendants knew as much when they objected to NJPURE's February 8, 2016 request for damages related discovery. If they believed that said discovery was necessary to the aforementioned defense then the Boynton Defendants should have considered simply producing same even if the request for the information was untimely.[9] The Court has no intention of reopening discovery now for any party.

The Boynton Defendants certainly have the right to raise a Daubert *in limine* motion regarding Mr. Soudry's Lanham Act damages calculation and the reliability of the basis for same. Whether they rely solely on that motion or have their expert also challenge the calculation based on the evidence in the record is up to them. However, as just stated, the Boynton Defendants are limited to the record as it currently stands. Discovery shall not be reopened.

---

[9] The Court notes that pursuant to Rule 26(a)(1)(A)(ii), a party has an obligation to provide "all documents" that it "has . . . and may use to support its . . . defenses, unless the use would be solely for impeachment."

**IV.     Conclusion**

For the reasons stated above, the Boynton Defendants' motion to strike is GRANTED in part. An appropriate Order follows.

Dated:  August 23, 2017

<u>s/ Tonianne J. Bongiovanni</u>
**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**